Good morning, Your Honors. I may please this Court. My name is Timothy Maggio, and I, along with my associate Shane Gladstone, represent Fidelity Federal Bank F.S.B. I would like to disclose to counsel that 20 years ago, when I was in private practice, I was a member of the American Arbitration Association and engaged in arbitration. I don't think at this point in time it creates any conflict, but if any counsel had objection, I would recuse. No objection, Your Honor. Thank you. Very good. Go ahead. No objection. Thank you. Your Honors, just to set the stage a bit, Fidelity is the appellant in Case No. 0256548 and 56381, which are appeals from the district court's decision to confirm rather than to vacate the arbitration award. Fidelity is also the appellee in Case No. 0356447, which is an appeal from the district court's grant of our Rule 60 motion to correct the rate of post-judgment interest. With the Court's permission, I would like to reserve seven minutes of time in order to reply to the arguments counsel may make on the merits and also then to respond to whatever arguments he might make with respect to interest. Again, with the permission of the Court, if I may then jump into the merits appeal. Your Honors, the focus of this appeal has just got to be on the integrity of the arbitration process. Can a person agree to serve as a neutral arbitrator without disclosing family relationships that might reasonably be thought to impact upon his ability to serve in that role? Counsel, under the agreement of arbitration, each side selected one arbiter, right? Yes, Your Honor. And the two arbiters were tasked with the obligation to select an independent third arbiter, right? I believe in this case, Your Honor, that the parties had agreed on the third one. I don't know that it was a selection of the two. It was certainly an independent third one, no doubt. Does it make really much difference in terms of a background check before the appointment is made as to whether arbiters that are representing a really sphere of interest, I'm going to put it, agree on the third arbitrator, or whether it's the disputing parties that agree on the third arbitrator, at least they have the opportunity to consult concerning who the arbiter will be or to take a list of 10 to start striking until I have one left or whatever the case may be? It just seems to me that there is some obligation before you turn to the courts to say we want this independent adjudication process, which is fast, supposedly inexpensive, supposedly efficient. We want to go that route. And now here you are. You've tied up a district court for a while. You've got us tied up in this case for a while. We completely defeat the theory of arbitration. If this happened in every arbitration case, there wouldn't be any more arbitrations. We'd start in justice court, take it on up from there. So what in this record shows that there was an examination made as to the independence and competence of the third appointed arbiter? I don't think there is anything regarding the third independent arbitrator, Your Honor, if that's your question. But that's not the arbitrator about whom we're talking in this case. That's not the objectionable arbitrator. Oh. So, well, let me shift it all then to the party finds an arbiter that he thinks is, and that's the case here, I guess. It's one of the parties that appoint an arbiter, and now they're unhappy with that arbiter switching the vote, right? Or coming over on the other side after hearing all the evidence. No. I don't think so. If I may just respond by way of narrative to you, Your Honor. Go ahead. What happened here in this case is that you're exactly right. Each party selected its own party arbitrator. And as Dergamoff posits, these are people who are supposed to act more like advocates than like actual judges. Fine. So far, so good. That's a matter of contract between the party and the arbiter selected, right? Certainly, their relationship between each other would be whatever their relationship is. That's right. However they've defined it. And the Court really doesn't have much to do with that. With respect, Your Honor, with respect to a party and a party-selected arbitrator, a court doesn't have much to do with that. But that's not this case, Your Honor, if I may. What happened here is at the very first meeting of the arbitration panel, a change was proposed. A new structure was put in place. What happened? All of the parties agreed that all three arbitrators would now act as neutral. There would no longer be the party-partisan arbitrators that counsels talked about. And if I may highlight just one fact to sort of substantiate that, when the proposal was made to my client, Fidelity, my client was happy with that proposal. And, in fact, it readily agreed that its arbitrator, former California Judge Ryan, could be released from any obligations she might have had to act as an advocate. Interestingly, though, Dergamont was also happy with that proposal. And in conversations that happened contemporaneously, Mr. Lieb, their arbitrator, now tells us that he had conversations with Dergamont's counsel to discuss the opportunity, and one of the things they talked about was the tactical advantage, if you will. And if I may just find the quick point, the tactical advantage they talked about is that the shift from party arbitrators, and this gets right to your point, if I may, Your Honor, the shift from party arbitrators to neutral arbitrators would, quote, avoid possible advocacy by Judge Ryan, our party-appointed nominee. In other words, she was clearly thought to be formidable, and there was a tactical advantage. What didn't happen at the time, when they decided to go ahead and shift, was they didn't tell us. No one said anything about the relationships between Arbitrator Lieb and Dergamont, this three-person law firm or, pardon me, Eggerman and Brown, the three-person law firm that represented Dergamont. So why didn't you ask at that point? I guess the thing that troubles me about your position is that you knew that two of the three arbitrators were party-designated arbitrators. Therefore, by definition, they were not neutrals. For whatever reason, you agreed later to turn them into neutral arbitrators. But that doesn't eliminate the fact that they were originally appointed as a party's arbitrator. So doesn't the rule contemplate that then there's an affirmative obligation on your part to ask, is there something about the nature of that relationship to determine whether or not you'd be happy with them? You know, I may respond to that both in terms of the factual assumptions added and the law, if I may. Two things. Let's just get the law out of the way. Commonwealth Codings, a Supreme Court seminal case here, says the duty to disclose is on the part of the arbitrator. It is not on the party, on the part of the parties to ask. They impose a, quote, simple requirement. There was that duty applied to a party-designated arbitrator? I mean, by definition, that person is not a neutral, right? When they're selected as a party arbitrator, no. What we're talking about, and I think it's confirmed as well in the J.D. Edwards case that we cite from Texas, is that when an agreement is reached to change, right, to change from your advocacy role to now your neutral role, at that point and this is what the J.D. Edwards case said, at that point the disclosure obligations of neutrals kick in. And if I may, though, come back to your question. But that's still not answering my question, is why didn't you ask? Well, I mean, you clearly had noticed that there was some kind of an affiliation by virtue of the fact that Dergamaw chose Mr. Lieb as their party-designated arbitrator. Now, it seems to me that that would set off some kind of an alarm in the mind of fidelity that there may be something about the relationship between Mr. Lieb and Dergamaw that we might like to know about at this point. Your Honor, may I respectfully challenge the factual premise of your question? It's just, it's just not correct. To say that somebody's... It's not correct that you should have been on notice or that an alarm goes off? To say that I should have been on notice or that an alarm goes off. And let me explain why, if I may. Okay. Right? You know, we selected Judge Ryan. Our selection of Judge Ryan was no hint that Judge Ryan was related to anybody, was no hint that Judge Ryan worked with anybody. To say that when someone is selected... You had to select her because you thought she would be sympathetic to your side or advance your side's position. Bingo. Absolutely right, Judge. And do you notice, though, what you said in the question? You can select a party arbitrator because you think he or she is liberal or conservative, he or she is plaintiff biased or defendant biased. He or she is a really smart cookie and knows a lot about this area of the law. To say that here's somebody that's selected as a party arbitrator and that, aha, therefore, that person must be in the side pocket of the party because they're related or they've worked together, I just, with respect, I just don't think that that factual predicate actually exists in the real world. And on top of that, I would say... You've got to be kidding, huh? I honestly couldn't. We selected Judge – I mean, keep in mind the facts of the case. We selected Judge Ryan. There's no hint that Judge Ryan was related to anybody on our side or was in anybody's side. Relationships can cut both ways, you know. But, I mean, you had to select her because you – I mean, I'm sure before – I would suppose that before your client selected her, they had a talk with her. They explained what their position was. And they got some sense from her that she agreed with their position. And so they appointed her. So they really appoint her as their advocate, you know. Your Honor, let me – I'm sorry. I keep interrupting. I apologize. May I respond to that? I admire your energy. I wish – what do you have for breakfast? You know, truth to tell, I don't have – I never have breakfast. I just have coffee with admittedly a fair amount of sugar in it. I can tell no lie. I can tell no lie. But exactly to your point, though, Your Honor, the items you were talking about are not items or relationships or causes that would suggest evident partiality. You can go ahead and pick an arbitrator because they're smart or, you know, you take a look at their track record and they seem to be very fond of the defense side or the plaintiff's side, all sorts of those reasons. But those reasons are not objectionable under the Federal Arbitration Act, Your Honor. What we're talking here is whether there are family relationships or relationships under this Court's standard that suggest a reasonable impression of partiality. Well, Mr. Maggio, let's come at it a different way. If I pick an arbitrator from my side, I can pick that arbitrator for any reason I want. It might be because I think they're the smartest person around and would be good on a complex commercial case. It might be because I think they're going to be biased in my favor no matter what the evidence is and hopefully rule in my favor as the arbitrator. That, I mean, the motive, I guess, is sort of cut across all spectrums. The question I'm asking you, though, is why wouldn't you want to know what motivated my selection at the point where we suddenly declare everybody to be neutral? Well, I mean, I can answer in the abstract because we weren't trial counsel at the time, so we weren't there. And trial counsel didn't ask. And I don't believe trial counsel did ask. But I think with respect, Your Honor, the same types of arguments you're talking about can be made just as well with the neutral. People were talking about, you know, do you pick them off a list or however they come. Well, you might also know, heaven forbid, you might also know that somebody on the list, a neutral but always sides, seems to, you know, if you just take a look at the pragmatists, they always side with your side. So you might select them because there's that bias. All I'm suggesting, Your Honor, and, you know, I can't get around the fact that nobody asked them at the time. All I'm suggesting is that to say that in the inherent, in the nature of a party-selected arbitrator is some notion that you should have known about in a disqualifying relationship, I don't think so. Should have asked. Should have asked. I understand. And, Mr. Maddrey, I'll get right to the heart of it here. Your predecessor didn't ask, and your client waited until after it had lost the arbitration award to raise the issue. And the case law and the rules say that's not how we play the game in arbitration. We don't sandbag and wait until we find out that we've lost before we come in and suddenly raise this claim to vacate the award. Again, with respect, it just might be a challenge, a couple of those points. The law, Commonwealth Codings says, and by the way, the descending Commonwealth Codings made exactly the point you did, Your Honor. Well, for goodness sakes, nobody asked. And the majority said it doesn't make a difference. The obligation is on the arbitrator to disclose, so don't tell us that nobody asked. The dissent also said, well, nobody's shown evidence that it actually changed the outcome. The majority said it doesn't make a difference. Once there's a poisoned arbitrator in the group. There's a distinction in that argument in that the initial appointment of arbiters was on the you take my side and the other arbiter will take and we'll get a neutral. That program was what got the three people there. It wasn't calling up the American Arbitration Association and saying send us three neutrals. And it turns out the two of them are biased one way or the other and you get a bad program. That's maybe what we're talking about in the case law. But this is a two-step. So you're saying that this was looking for advocates initially and then changing to the unit, to an unbiased panel? Well, it was the only, the only. Do you think counsel would be alerted to that, that what was going on? Well, Your Honor, again, I can only, I can only say historically perhaps not because counsel actually chose Judge Ryan, who I'm sure was just Judge Ryan, who's a very formal person, a very bright person. We also, I'm sorry. If you're looking for an advocate, you can ask for a professor, you can ask for an engineer, you can ask for a lawyer, you can go shop for whatever you want. But when you're looking for neutrality and you say to the three arbiters, we're now switching to a neutral panel, it seems to me that one side or the other ought to question somebody that's been appointed as an advocate. That's all. And absent the undertaking of that duty weighs it. Yeah. I'm not sure I could advance it more than to say two quick things in response to that, and then I would like to reserve a little time. But first, I'd ask you again. But you're really, what you're really saying is that once the decision was made to convert them all to neutral arbitrators, that that's when these rules kick in. That's precisely. As far as neutral arbitrators are concerned. That's precisely what we're saying. It's their duty to disclose if they have any bias or prejudice or interest in either party. That's precisely what we're saying, Your Honor. Yes. And it's also the whole thing in the J.D. Edwards case we're talking about. And, Your Honor, if I might just quickly come back to your points and then reserve some time. If I just might draw your attention again to the Commonwealth Codings case. There's the Middlesex case that we talked about in our papers as well. And the Middlesex case talked about exactly that. There were lawsuits brought involving the neutrals law firm and one of the parties. And they said, well, for God's sakes, there were lawsuits out there. And you, the party, have the tools, the ability to look them up and try to figure out and learn more about who the arbitrator was. So it was precisely the point you were making, Your Honor. You didn't have an obligation to look at it. And the Court there said, and I apologize, I don't want to call it the circuit. The Court there said, no, the obligation in Commonwealth Codings firmly places it on the arbitrator, and we're not going to turn the tables, in their phrase. We're not going to turn the tables and shift this important obligation, and especially all the more, I would suggest, when it's a family relationship. Your Honors, I believe I have three and a half minutes left out of my 20. If – I don't want to cut this short, but if I may reserve that time for reply. All right. Thank you, Your Honors. I'm not even going to try to be as energetic. Good morning. May it please the Court. My name is Philip Brown. I represent Dergamau Corporation. And with me in the courtroom is Lee Eggerman, my colleague and who co-counseled during the trial. And sitting with him is Roger Gupta, one of the two shareholders of Dergamau Corporation, who is also a member of the New Jersey Bar, who flew in to watch today. There are so many interesting issues on both of the appeals. Let me start with the one that we're talking about, that is the appointment of the arbitrator. Dergamau does not concede that on the October 2, 2000 telephone conference call, that the arbitrators converted from party-appointed arbitrators to neutral arbitrators. It is clear that the only time there is a duty to make a disclosure statement is if, in fact, there is that conversion. All three arbitrators filed a declaration with the district court saying they didn't believe there was such a conversion. I didn't believe there was such a conversion. I saw the declaration, and it's obviously very carefully drafted, as I would expect good lawyers to do. But if the arbitrators agreed that they would act neutrally, which I believe is the term, I mean, aren't we splitting hairs here? If a person says I'm going to act neutrally, it means I'm going to act without favor to one side or the other, without disability. Two things, if I might. First, I didn't draft that declaration. Okay. That was drafted by, apparently, the neutral, Viggo Busserup, who is also a member of the Bar. Second.  We never get the people in here that did this stuff. Somebody said an expert is the guy that's out of town. Second. When this became an issue, when Fidelity made its motion, I contacted some experts and had them look at it. And the principal one on this particular issue was Dean Folberg of Golden Gate University, who's on the blue ribbon panel. And he said there was no such conversion. There can't be. Unless you make it crystal clear that's what's going to happen. The second point is, even if there were a conversion under the facts of this case, there's nothing to disclose. There is no relationship. The relationship was so attenuated by time and circumstance, by 25 years of post-divorce, which Mr. Lieb calls a bitter divorce, with no contact of any kind between Mr. Lieb and his former in-laws. And my contact with Mr. Lieb, which ended in an argument in this court in 1978, I believe, and I had no contact with him for 20 years except for an occasional lunch. There is no case anywhere in the last 34, 35 years that there are reported cases on the duty to disclose which touches anything remotely close to these facts. The cases really focus on the following kinds of things. A financial relationship, past, present, or potentially in the future. A very close family relationship, such as in Morlite, where the arbitrator was the son of the president of one of the parties, where there is something that says in these facts, this person can't be fair. He can't be impartial. There's no evidence of anything remotely touching that in this case. The relationships are simply too tenuous. The third is, if, in fact, Fidelity believed that the arbitrators had converted into neutral arbitrators as a result of the October 2 telephone conference, they had already means, actually they had several means, by which to find out and get a disclosure statement under State law, under Code of Civil Procedure, Section 1289.1, the 1281.9, there is a procedure to request a disclosure statement, and if the neutral arbitrator doesn't give you a disclosure statement, you have 15 days within which to have him disqualify. And that happens automatically. There was no such request. Under the rules of the American Arbitration Association, if, in fact, a neutral arbitrator doesn't give you a disclosure statement and fails to do so, you simply notify either the person in charge of the panel or the panel administrator that the person is going to be disqualified, and that happens automatically. There were two easy things. Counsel referred to the Middlesex case, a case that came out of Florida in which a neutral arbitrator did not disclose his litigation, ongoing litigation, with one of the parties. In that case, the Court said you have to conduct an investigation, or you don't have to because it's too hard, it puts too much of a burden. This isn't Florida. This is California. We were conducting this arbitration under the rules of the American Arbitration Association and the laws of the State of California, which provided a ready avenue for Fidelity to raise questions, if they believed it were appropriate, about Mr. Lieb's impartiality. But they didn't do so. And I think, in fact, the reason they didn't do so is they didn't also believe that he had been converted from a party arbitrator to a neutral arbitrator with disclosure responsibilities. But if they did, they have to take the steps that are necessary to find out, because, as Your Honor pointed out, you can't go through the whole thing with a King's X and at the end say, aha, you didn't make a disclosure statement and wipe it out. This Court, in 1993, made a perfect statement in Marino v. Writers Guild East, I believe, that you can't go through an arbitration and then later raise the question of the bias of an arbitrator. You have to do it when you have the means and the opportunity to do so before you start. Next, let me change, if I may, to the interest rate issue. And before I get started, I have an admission to make. I made a mistake in the representations that I made to the Court in the brief with regard to the standard of review. I had argued that the normal standard on a Rule 60b is abuse of discretion, but I had argued in my brief that, in fact, the standard of review is de novo because there are no facts involved and this Court has the opportunity and the power to review this de novo. I think, in fact, that's wrong. Over the weekend, when I read through these briefs again for the umpteenth time, and then I did some work, I found an unpublished opinion from this Court that makes it crystal clear. And I believe that the standard of review is as stated by Fidelity, and that is abuse of discretion. The problem is that when the Court entered its judgment with interest at 10 percent The cases say pretty clearly that a Rule 60b review is abuse of discretion. I had thought that it was de novo for the very reason that you said. But apparently, according to Lazo v. Washington Mutual Bank, a 2001 decision unpublished of this Court, it made it pretty clear. It's not precedent. You can cite to us. Go read the opinion or the memorandum disposition as a footnote. This is not citable to any court in the Ninth Circuit. I understand. I'm simply saying it changed my mind. That's all. That's fine. That's your position. That's fine. That's one thing. If you're saying it's our position, that's something else. No, I'm not. I'm trying to explain why it changed so that I'm apologizing. Well, you don't have to apologize. Well, I don't like making representations to a court of a position that I later It's an open question. It's got to be decided. Just give it a shot. Don't worry about it. Okay. Well, no, I think there was an abuse of discretion in this case. That's what I really mean to say. And it comes about this way. After the judgment's made, if you want to change, alter or amend the judgment, Rule 59 says you have 10 days within which to make that claim, that motion. Fidelity didn't do so. Rule 60b says you get extra time, up to a year, if you have the grounds. Okay. But you have to have the grounds. This was a Rule 59 change of the judgment extended by Rule 60b if fidelity qualifies. But if you look at the record, they didn't present any facts whatsoever, other than the fact that the judgment should be different under Federal law. The Fidelity's motion is in the excerpts of record at 31, and it's in tab 6. And their reply to my opposition is at the excerpts of record 99, which is tab 10. Nowhere is there a declaration stating any fact of any excuse, any explanation whatsoever for why they took so long. For why they missed it the first time. Why they qualify to extend the Rule 59 10-day limitation. There is no evidence before the district court. There was, in fact, in the appellee's brief on this issue, an explanation. But it was the first time it came about, because it certainly wasn't in the record below. The explanation is they didn't understand that the 1961 procedure for calculating interest was something other than what the Court did. They finally woke up 10 months later. No explanation of what the facts are to justify relief under Rule 60b. Nothing in the record whatsoever. I think that there is no basis for the Court to grant an extension of the Rule 59 10-day limitation. It doesn't make any sense. I mean, I'm not aware of any fact law that would allow this kind of explanation. The courts, I mean, the decisions are clear with regard to Rule 60b requiring some showing of an excuse, some excusable neglect, some excusable mistake, some excusable inadvertence. It just can't come back 10 months later and say, whoa, wait a minute, we want to change this for something that you had the power, the opportunity, and the ability to correct right when it happened. There is no justifiable reason. The most that Fidelity says now is it just didn't understand Section 1961. It didn't understand that the interest rate that is expressed in the judgment is different than what you're entitled to. But there's no justification for them making, not knowing it. I mean, this Court has ruled that somebody who missed a deadline by two days is too late. There is no excuse. But what if the fault is actually the clerks or the district court judges, simply because they didn't read the statute? If it's a clerk, it's a Rule 60a, I believe. Okay. And that's open. But it was the judge who signed the order, and the order contains the language, doesn't it, confirming the award and interest at the rate of 10 percent? It was included in the motion. It was included in the proposed order. It was included in the judgment itself. And the judge just signed off on the order that I assume you had drafted? I did. Yes. Okay. So the judge missed it. I mean, you know, it wasn't really anybody's fault. It was just, I mean, you may have known, you know, exactly what you intended, but the judge may not have been thinking about Section 1961a at the time that he signed the order. I don't know. They never raised the issue. It's Fidelity's responsibility to have raised the issue. But you're arguing that they haven't shown excusable neglect. And my question is a different one. What if we now look at it and say, look, as a matter of law, Section 1961a says that this is a Federal judgment, that in Federal courts, post-judgment interest is set by the 52-week T bill, that's the law, and regardless of whose fault it was, whether it was inadvertence, mistake, clerical error, the Court has the power to correct the judgment so that it complies with the law? There is an appeal to that argument. There is an appeal. It's just sort of a common-sense kind of appeal to that. I've tried to look at cases like this. I find that that's an awful way to do my job. No, but it just strikes, I think, anybody who listens to it as just a common-sense way to approach this. But in fact, we have the rules established by the rules, Rule 59 and Rule 60b, which say you have to do certain things in a certain way. And if you don't do them, it can't go back and complain. What should have happened is there should have been a motion for reconsideration, I believe, but they couldn't do it because they don't qualify. They can't come back under Rule 59 because it's too late. So they try to do Rule 60b, but they can't show any explanation, any justifiable excuse for the law not to be followed the way it's written. That's ultimately what it is. But you've actually launched into what I think is a really important question, and that is, what is the right interest rate in this case? Because I think it's clear that, number one, the arbitrators had the power to make an arbitration award that says interest at 10 percent until paid. Well, I would agree with you if the contract said so. Okay. But the problem here is that it seems to me that the arbitrators just simply declared the interest rate shall run at 10 percent. I assume that they were looking at California's interest on judgment statute. But then you chose to come to Federal court and ask that this arbitration award be confirmed as a Federal judgment. And it seems to me that's when 1961a kicks in, so that the 10 percent, they can set whatever interest rate they want under California law for prejudgment interest. Yes. But it seems that once the award is confirmed and the judgment is entered in Federal court, why doesn't section 1961a then control on the post-judgment interest from that point until collected? Excellent. Number one, this Court has ruled no. I want to get an excellent answer. Look out. Here it comes. This Court has held in Citicorp v. Smith that an arbitration award can, in fact, continue a rate of interest different than the 1961 interest rate, okay, if the parties have agreed. The question is, what have the parties in this case authorized these arbitrators to do? They authorized these arbitrators to review the facts and make a ruling and make an award, and they made an award. They did not add, unfortunately, because we wouldn't be here. They didn't add all the way until the award is collected. But that seems to be the clear implication of what they did, because what they didn't do is they didn't say, if you go to Federal court, interest will switch to the Federal rate. They didn't say that. And the parties didn't agree in the underlying contract to an award of interest that would apply to any arbitration award that might be entered. But the arbitrators had the power to say in their arbitration award, in this case, Dergamont v. Fidelity, to say interest at 10 percent until the award is paid. They had the power to do that. And my concern is not with the 10 percent on the prejudgment. I'll give you that. But it's the postjudgment under the statute that I'm having trouble with. I think I'm making a distinction, because I think if they said 10 percent on the judgment, on the award, until paid, that means until paid. Kennedy, when you get an arbitration award reduced to a judgment, isn't it like getting a promissory note reduced to a judgment? No. The note merges into the judgment. The award merges into the judgment. We're talking about a judgment, not an award anymore, right? That's another one of the fascinating questions in this case. I think not. And I think for this reason, not so. This is where the parties have said, we're going outside the legal system, we're going to have an arbitration, and we're empowering these three people to make a conclusion, and that's it. Sure. Okay? And that's it. And if they say you get 20 percent until it's paid, that's the deal. The fact that Fidelity chose to start this process in district court I don't think changes what the arbitrators decided. Shouldn't we be saying to you, then, if the arbitration award does not emerge into the judgment, we really can't give you any relief. You just go any way you want and enforce your darn award. We're not going to reduce it to a judgment. All we're doing is saying whatever the award is is okay, but we're not going to give you any enforcement power. The marshal is not going to go out and seize any property or bank accounts or anything under a judgment. We're not going to dirty our hands with 10 percent interest. You take the Federal rate that's by statute or forget it. Why isn't that the rule, as you argue it? I don't believe that that's the rule. When, in fact, the arbitrators ---- You want a little bit of this and a little bit of that. You want part of the award and you want part of the benefit. Right? When Fidelity chose to seek to vacate the award, they initiated that in district court.  Okay? And they had the power to do so because of the diversity issue. And you asked the court to affirm the award. Well, we were right there. And you wanted it in a judgment, right? Yes, that's correct. Why didn't you just get a declaration that the award was okay and quit? Why did you want a judgment? Because I wanted to be able to enforce it. Sure. Under Federal terms, low rates of interest. I don't think so, because, in fact, the law is clear. The district court doesn't have the power to change the arbitration award. No, but the statute does if they're going to get a judgment. But not the award. You can't change the award. No, the award is merged into the judgment. That's my point. I don't believe, in fact, that's how it works. It's my understanding that when arbitrators make an award, you can either knock out the award because they didn't either ---- they did something ridiculous or there was bias, partiality, corruption, fraud, none of which is here. Mr. Brown, let me ask you a different question. Suppose the arbitrators had said nothing about interest. Wouldn't you concede that once the award was converted to a judgment, that 1961A would then provide the rate of interest post-judgment? Absolutely. No question about that? Absolutely. All right. Okay. And my time is up. Thank you very much. Thank you. Thank you. Thank you. My time is brief. I'd like to just spend a few seconds cleaning up a few points. One, counsel said that Dergamont does not concede the issue of neutrality at this point and referred to the one of the declarations. There's a boatload of facts in our brief. I won't rehearse them all here. Let me just highlight one thing about the facts, though. They come from every source. The factual sites we have come from Mr. Lieb himself, Judge Ryan, Umpire Boesrup, the arbitration panel as a whole, Fidelity's counsel at the time, and Dergamont's counsel at the time. It does bear noting that in the arbitration ---- that there was a deposition taken in the arbitration of Dergamont's counsel, and the following question was asked. But it is your understanding that there was an agreement reached that each of the arbitrators ---- pardon me ---- in fact would act as neutral arbitrators? Answer, yes. And that's found in our excerpts of record at 151. Arbitrator leaves the same thing in his declaration. After having agreed to act neutrally, I did so in every respect. I would suggest that that ---- again, there's a whole range of facts out there, but I would suggest that puts to a close the question of whether there was neutrality here. I'm not going to talk about the choice of law questions unless Your Honors are interested in that. I'm prepared to do that, but I don't know that there are any questions you have. Now, let me just say quickly about evident partiality and then take the last minute and refer to the interest rate. However one looks at these cases, I mean, I think the reality of it is that Federal law imposes the obligation on the arbitrator to disclose, as the Supreme Court said, tell people about your dealings. That was their simple requirement. All they said in common with Codings was tell people about your dealings. Here we have relationships that we think are significant family relationships, born of a marriage that lasted for 17 years. There are hooks and links that last today. People in the Eggerman and Brown firm are cousins with the arbitrator's children. The uncle-nephew relationship still exists. Those are important family relationships that survive until today. To get back to one point that Your Honor was making about shouldn't the tables be turned, let me just, I apologize, I didn't have the cite before. From a Middlesex case, it's 675 F. Second at 1204. By positing that appellants have the duty to inquire into the background of the arbitrator appellant attempts to shift to the parties to the arbitration the burden of determining and disclosing bias or the reasonable appearance thereof. Neither Federal nor Florida law supports such a result. That was the point that we were looking at. If I may briefly turn to the question of interest, although that seems to be relatively Your Honor, I just want to point out one point Judge Tolman, I think you had suggested that the arbitration award said that it awarded 10 percent. It actually makes even just a vaguer reference to just the statutory interest rate. It seems to me that. Well, there is no prejudgment Federal statutory interest rate, right? Federal, in a diversity action, Federal law would graph a substantive statement. To state law. Exactly right. Which is 10 percent. For prejudgment interest, absolutely. Right. Okay. And we don't challenge that. Okay. I just wanted to clear up that one little factor issue. Your Honor, as I see my time has elapsed, I apologize. Thank you very much. Okay. Thank you. The matter will stand submitted, and the Court will recess until 9 a.m. tomorrow morning. All rise. The Court for this session stands adjourned. Thank you, Your Honor.
judges: Pregerson, Beezer, Tallman